# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **NANCY LENORA DORRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:04-0870** |
| **v.** | ) | **Judge Nixon / Knowles** |
| | ) | |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. Plaintiff, who is proceeding pro se, has filed a document entitled "Response to Information in the brief," which the Court will construe as a Motion for Judgment on the Administrative Record. Docket Entry No. 9. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 13.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion be DENIED, and that the decision of the Commissioner be AFFIRMED.

1

# I.  INTRODUCTION

Plaintiff filed her current application for SSI on February 20, 2001 (TR 567-569), and her current application for DIB on February 21, 2001[1] (TR 108-110), alleging that she had been disabled since November 24, 2000 (TR 108, 567), due to back problems, rotator cuff tear, seizures, shortness of breath, sleep problems, carpal tunnel, emphysema, difficulty walking, gastric reflux, anemia, nerves, and irritable bowel syndrome[2] (Docket Entry No. 7, Attachment ("TR"), TR 17-18, 71-74, 149).  Plaintiff's applications were denied both initially (TR 71-72, 570-571) and upon reconsideration (TR 73-74, 577-578).  Plaintiff subsequently requested (TR 92-93) and received (TR 39-66) a hearing.  Plaintiff's hearing was conducted on October 9, 2003, by Administrative Law Judge ("ALJ"), John P. Garner.  TR 39.  Plaintiff and vocational expert ("VE"), Jo Ann Bullard, appeared and testified.  *Id.*  Plaintiff's ex-husband, Gary Dorris, also appeared and testified.  *Id.*

On April 5, 2004, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 14-30. Specifically, the ALJ made the following findings of fact:

---

[1]On October 9, 1997, Plaintiff filed applications for DIB (102-106) and SSI (TR 553-55), which were denied both initially (TR 67-68, 556-567), and upon reconsideration (TR 69-70, 563-564).  The record does not contain any indication that Plaintiff continued to pursue these applications.

[2]This list of Plaintiff's disability allegations is found in the ALJ's decision.  TR 17-18. Plaintiff's Disability Determination and Transmittal forms allege the following disabilities: epilepsy, chronic pulmonary insufficiency ("COPD"), and carpal tunnel syndrome, (TR 71-72), as well as a lung problem, a "deteriorating rotor cup," low back pain, emphysema, gallbladder surgery, and back surgery (TR 73-74).  On Plaintiff's Disability Report, she alleges: "seziures [*sic*], the lung problem conctant [*sic*] coughing, corpul [*sic*] tunnell [*sic*] sugery [*sic*] on both hands limits hand and arm movement."  TR 149.

2

1.      The claimant met the insured status requirements of the Act as of the alleged disability onset date, November 24, 2000.

2.      The record indicates that the claimant has not engaged in substantial gainful activity since November 24, 2000.

3.      The claimant has a history of back surgery and has a combination of impairments considered "severe," which includes cervical and lumbar degenerative disc disease with lumbar stenosis, chronic obstructive pulmonary disease and reactive hypoglycemia.

4.      This combination of impairments does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The claimant has the residual functional capacity to perform medium work activity which accommodates the occasional lifting and/or carrying of 50 pounds; frequent lifting and/or carrying of 25 pounds; standing and/or walking for six hours in an eight hour workday; sitting for six hours in an eight hour workday; the avoidance of concentrated exposure to vibration, fumes, odors, dusts, gases and poor ventilation; and the avoidance of even moderate exposure to unprotected heights and moving machinery.

7.      The claimant's past relevant work did not require the performance of work-related activities precluded by her residual functional capacity.

8.      The claimant's impairments do not prevent her from performing all past relevant work.

9.      The claimant has been "not disabled," as defined in the Act, since November 24, 2000.

TR 29-30.

On June 1, 2004, Plaintiff filed a request for review of the hearing decision.  TR 13.  An

3

attorney's letter dated June 1, 2004, became part of the record on July 28, 2004, by Order of

Appeals Council. TR 12. On the same date, the Appeals Council issued a letter declining to

review the case (TR 9-11), thereby rendering the decision of the ALJ the final decision of the

Commissioner.[3] This civil action was thereafter timely filed, and the Court has jurisdiction. 42

U.S.C. §§ 405(g) and 1383(c)(3). If the Commissioner's findings are supported by substantial

evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability due to seizures, back problems, rotator cuff tear, seizures,

shortness of breath, sleep problems, carpal tunnel, emphysema, difficulty walking, gastric reflux,

anemia, nerves, and irritable bowel syndrome. TR 17-18, 71-74, 149.

On July 18, 1997, Dr. Ralph Ruckle ordered an x-ray of Plaintiff's right shoulder,

because of her history of "pain." TR 487. Dr. Mark Born analyzed Plaintiff's x-ray, which

revealed, "[d]egenerative changes about the AC joint" and "[o]therwise no abnormality." *Id.*

Dr. Born suggested, "[i]f an internal derangement of the shoulder continues to be suspected, then

consider MRI." *Id.*

On September 3, 1997, Dr. Charles W. Emerson, Jr. treated Plaintiff for her right neck

and right shoulder pain. TR 486. Upon physical examination, Dr. Emerson found that Plaintiff

had "marked tenderness in the mid-substance of the right trapezius muscle." *Id.* Dr. Emerson

noted that Plaintiff's "x-rays which were brought in did reveal some degenerative change of the

---

[3]The dates stamped on both documents are illegible (TR 9, 12), but the Court Transcript
Index (the page before TR 1) lists the date as July 28, 2004.

4

acromioclavicular joint." *Id.* Dr. Emerson suggested that Plaintiff start Indocin and "locally

apply ice today to her shoulder and then beginning tomorrow ... apply heat several times daily."

*Id.* Also on September 3, 1997, Dr. Emerson administered two Lidocaine injections into

Plaintiff's right shoulder.  TR 482.

On October 17, 1997, Dr. Emerson treated Plaintiff for shoulder pain.  TR 485.  Dr.

Emerson stated that Indocin had helped to relieve Plaintiff's pain, but did not "completely

relieve her." *Id.* Upon physical examination, Dr. Emerson found that Plaintiff had "tenderness

in the lower neck area and upper dorsal region." *Id.* Dr. Emerson ordered an MRI of the

cervical and dorsal spine in order to "rule out nerve impingement or protruded disc at these

levels."[4] *Id.*; *See also*, TR 478.  Dr. Emerson prescribed Soma and instructed Plaintiff to apply

heat locally.  TR 485.  Dr. Emerson also prescribed "P.T. - U.S. & intermittent cervical

traction."[5]  TR 479.

On December 10, 1997, Dr. William Clark completed a Physical Residual Functional

Capacity Assessment ("RFC") regarding Plaintiff.  TR 228-235.  Dr. Clark opined that Plaintiff

could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand

and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday;

and push and/or pull without limitation.  TR 229.  Dr. Clark further opined that Plaintiff could

frequently perform climbing, balancing, stooping, kneeling, crouching, and crawling.  TR 230.

---

[4]The record does not contain that MRI report, which apparently was performed on
October 23, 1997.  TR 478

[5]An entry dated December 5, 1997, indicates that Plaintiff was discharged from physical
therapy after showing "no improvement."  TR 477.  The signature on this document is illegible.
*Id.*

5

Dr. Clark stated that Plaintiff had "limited" abilities to perform "handling" and "fingering" activities. TR 231. Dr. Clark also asserted that Plaintiff should "avoid all exposure" to "Hazards (machinery, heights, etc.)." TR 232.

On December 16, 1997, Dr. Larry Welch completed a Psychiatric Review Technique Form ("PRTF") regarding Plaintiff. TR 236-244. Dr. Welch found that Plaintiff had "Affective Disorders" (TR 236), which were manifested through a "Disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidence by ... NOS" (TR 239). Dr. Welch also found that Plaintiff had "Mental Retardation and Autism" (TR 236), which were manifested through a "Significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22), or pervasive developmental disorder characterized by social and significant communicative deficits originating in the developmental period, as evidenced by ... BIF" (TR 240). Dr. Welch indicated that Plaintiff had a "Substance Addiction Disorder" (TR 236), which was in "early, partial remission x 3 mos" (TR 242). Dr. Welch found that Plaintiff had "Slight" limitations in her "Restriction of Activities of Daily Living," and in her "Difficulties in Maintaining Social Functioning." TR 243. Dr. Welch also found that Plaintiff "Often" had "Deficiencies of Concentration, Persistence or Pace Resulting in Failure to Complete Tasks in a Timely Manner (in work setting or elsewhere)." *Id.*

Also on December 16, 1997, Dr. Welch completed a Mental RFC regarding Plaintiff. TR 245-247. Dr. Welch found that Plaintiff was "Moderately Limited" in her abilities to "carry out detailed instructions," to "maintain attention and concentration for extended periods," and to "perform activities within a schedule, maintain regular attendance, and be punctual within

6

customary tolerances." TR 245. Dr. Welch also found that Plaintiff was "Moderately Limited" in her abilities to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace with an unreasonable number and length of rest periods," to "get along with coworkers or peers without distracting them or exhibiting behavioral extremes," to "maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness," and to "respond appropriately to changes in the work setting." TR 246. Dr. Welch further found that Plaintiff was able to "adjust to routine, not frequent change," and to "maintain moderate pace, carry long range goals and avoid hazards." TR 247.

On December 24, 1997, Dr. Emerson treated Plaintiff for "general persistent pain in her neck, and primarily her left shoulder, with some intermittent numbness and tingling in the left upper limb." TR 475-476. Upon physical examination, Dr. Emerson found that Plaintiff had a "full ROM of the shoulder, with 4-5/5 muscle strength," "basically full ROM of the cervical spine," and "some diffuse tenderness in the dorsal spine." TR 475-476. Dr. Emerson reduced Plaintiff's medication to a "maintenance dosage," and instructed her to "apply heat locally for pain relief." *Id.*

On March 11, 1998, upon referral from Dr. Ruckle, Dr. Mary Ellen Clinton treated Plaintiff for a complaint of seizures. TR 248. Dr. Clinton ordered a CT scan of Plaintiff's brain, which revealed a "Prominent right vertebral artery," but was "Otherwise negative." TR 397. Dr. Clinton opined that, "Some spells are likely anxiety induced," and she prescribed medications

7

for Plaintiff.[6]  TR 248.

On March 30, 1998, Dr. Robert E. Burr completed an evaluation of Plaintiff's impairments on behalf of the Tennessee Department of Human Services ("DHS").  TR 260.  Dr. Burr indicated that he could not make a determination about Plaintiff's impairments because of insufficient evidence, and he found that additional development was needed.  *Id.*

On April 28, 1998, Dr. Burr completed a Physical RFC regarding Plaintiff.  TR 261-267.  Dr. Burr found that Plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and push and/or pull without limitation.  TR 262.  Dr. Burr further found that Plaintiff could frequently perform climbing, balancing, stooping, kneeling, crouching, and crawling, but could never perform climbing on "ladder/ rope/ scaffolds."  TR 265.  Dr. Burr stated that Plaintiff had no manipulative, visual, communicative, or environmental limitations (TR 266-267), except that Plaintiff should "avoid all exposure" to "Hazards  (machinery, heights, etc.)" (TR 267).

On February 2, 1999, Plaintiff was treated at Tennessee Christian Medical Center ("TCMC") for seizures and her inability to sleep.  TR 272.[7]  Plaintiff's "review of systems" indicated that she was experiencing night sweats, blurred vision, headache, swelling in her hands, and depression "since off med (Klonipin)."  *Id.*  Upon physical examination, Plaintiff had

---

[6]Many of the handwritten comments are illegible, as are the names of the prescription medications.  TR 248.

[7]The signature on this document is illegible.  TR 272.

8

"diffuse tenderness" of her right and left "LQs."[8]  TR 271.

On February 3, 1999, Dr. Ruckle treated Plaintiff for complaints of diarrhea, stomach cramps, nausea, fever blisters, and seizures.  TR 360.  Dr. Ruckle noted that Plaintiff stated: "I don't think I have seizures - I think I have diabetes." *Id.*  Dr. Ruckle also noted Plaintiff's report that her seizures had become more frequent after she did not take "Klonopin." *Id.*  Dr. Ruckle instructed Plaintiff to drink clear liquids for 24 hours.[9] *Id.*

March 2, 1999, "progress notes" from Dr. Ruckle's office indicate that Plaintiff went to an "emergency room."  TR 358-359.  Apparently, Plaintiff went to the emergency room without a referral, and was not treated because she did not have a "life-threatening" situation. *Id.* Plaintiff reportedly threatened to change doctors.  TR 359.

On March 30, 1999, Dr. Ruckle noted that Plaintiff telephoned his office to request "muscle relaxers" for her "pulled back"; he prescribed Flexoril.  TR 356.

On April 27, 1999, Dr. Ruckle treated Plaintiff for abdominal pain, nausea, diarrhea, and indigestion.  TR 355.  Dr. Ruckle reported that Plaintiff stated that she ate "one pac [*sic*] of tums daily."  *Id.*  Upon physical examination, Dr. Ruckle noted that Plaintiff's general appearance was normal, and that she had "GI symptoms."  *Id.*  Dr. Ruckle's diagnoses of Plaintiff included a "seizure disorder," abdominal pain, nausea, diarrhea, and indigestion.  *Id.*

On November 8, 1999, Dr. Ruckle treated Plaintiff for bronchitis.  TR 351-353.  Dr.

_____

[8]There is an undated TCMC document, signed by "Ms. Riggenbach," entitled "physical examination," which indicated that Plaintiff had "Diffuse tenderness. esp R & L LQ."  TR 271. Ms. Riggenbach did not complete the "Diagnosis" section of the document.  *Id.*

[9]At this visit, Dr. Ruckle conducted a breast examination, but did not order or perform any other tests.  TR 360.

Case 3:04-cv-00870   Document 14   Filed 06/08/06   Page 9 of 43 PageID #: 9

Ruckle conducted a physical examination of Plaintiff, which revealed that she was "coughing yellowish mucous" and was experiencing "chills."  TR 353.  Dr. Ruckle diagnosed Plaintiff with bronchitis, and prescribed antibiotics.  TR 353.

On February 10, 2000, Dr. Ruckle treated Plaintiff for complaints of "throbbing" and "constant" pain in her shoulders and legs.  TR 350.  Upon physical examination, Dr. Ruckle noted that Plaintiff had pain in her "Bil. shoulder joint" and "AC joint."  *Id.*  Dr. Ruckle reviewed Plaintiff's prescription.  *Id.*

On March 21, 2000, Dr. Ruckle treated Plaintiff for complaints of pain in her shoulders, swelling in her hands, and a "loss of grip" in her hands.  TR 349.  Dr. Ruckle noted that Plaintiff had received "injections" in her shoulders, that they had "helped until [a] couple mos. ago."  *Id.* He also noted, "Vicodin dulls pain - doesn't stop it."  *Id.*  Dr. Ruckle ordered an x-ray of Plaintiff's cervical spine, which revealed "Some loss of height of the C5-6 disc," but "Otherwise no abnormality."  TR 269.

On March 23, 2000, Dr. Ruckle treated Plaintiff for pain that was radiating "across both shoulders into and down both arms and hands."  TR 348.  Dr. Ruckle reviewed an x-ray report, and upon physical examination, noted that both of Plaintiff's hands had numbness, tingling and swelling.  *Id.*  Dr. Ruckle prescribed "Dexamethason 1% Lidocaine Injection B/L."  *Id.*

On April 5, 2000, Dr. Ruckle ordered an MRI of Plaintiff's cervical spine because of her history of cervical radiculopathy, and because of her complaints of "Neck pain, bilateral arm pain, [and] weakness greater than six weeks duration."  TR 268.  Plaintiff's MRI revealed, "Mild posterior leftward C5-6 disc bulge and spondylosis," and "No significant abnormality."  *Id.*

On May 26, 2000, Dr. Ruckle again recorded that Plaintiff had received a cortisone

10

injection in her right shoulder, but that she experienced "continued shoulder pain." TR 345. Dr. Ruckle indicated that Plaintiff had requested medication, and that he had prescribed Vicodin. *Id.*

On June 26, 2000, Dr. Ruckle treated Plaintiff for complaints of a seizure, depression, and shoulder pain. TR 344. Dr. Ruckle's "review of systems" revealed that Plaintiff had "myalgias, arthralgias, [and] joint swelling" of her shoulder, as well as ulcers and depression. *Id.* Dr. Ruckle indicated that Plaintiff had insomnia and a "seizure disorder." *Id.*

On September 12, 2000, Dr. Ruckle treated Plaintiff for complaints of soreness in her arms and elbows, and swelling in her left arm. TR 341. Dr. Ruckle prescribed another cortisone injection.[10] *Id.*

On January 8, 2001, Dr. Verna Bain treated Plaintiff for bronchitis, "COPD," and a "chest cold." TR 386. Dr. Bain conducted a chest examination that revealed "No radiographic abnormality."[11] TR 373. Dr. Bain also ordered an ECG, the results of which were normal.[12] TR 374.

On January 24, 2001, Dr. Bain treated Plaintiff for a "nagging cough" and heartburn, and noted that Plaintiff smoked. TR 385. Dr. Bain ordered another chest examination, which revealed "No radiographic evidence of acute disease." TR 372.[13] Dr. Bain prescribed Medrol, Tylenol, and Codeine. TR 385.

_____

[10]The record also contains lists of Plaintiff's medications prescribed from December 2000 to December 2001. TR 340, 343, 347, 354.

[11]There is a second copy of this chest examination at TR 284.

[12]There is a second copy of the ECG at TR 285. Dr. Bain's diagnoses and prescriptions are illegible. TR 386.

[13]There is a second copy of this chest examination at TR 283.

On January 27, 2001, Dr. Bain treated Plaintiff for "COPD exacerbation" and "RUQ tenderness." TR 384. Dr. Bain's physical examination of Plaintiff revealed "good arm movement bilaterally." *Id.* Dr. Bain referred Plaintiff for a gallbladder ultrasound. TR 384.

On February 1, 2001, Dr. Bain ordered an "AI-Ultra Gallbladder" ultrasound because of Plaintiff's vomiting and "rt upper quad pain." TR 282. Plaintiff's ultrasound revealed "cholelithiasis." *Id.*[14]

On February 12, 2001, Dr. Bain treated Plaintiff for a complaint of pain in her right hip and a request to have her "lungs checked." TR 383. Upon physical examination, Dr. Bain found that Plaintiff's lungs were "clear." *Id.* Dr. Bain diagnosed Plaintiff with "umbilical cellulitis," "COPD," right hip pain, and lower back pain. *Id.* Dr. Bain instructed Plaintiff to apply Neosporin and ordered an x-ray of Plaintiff's "L-S Spine" and right hip.[15] *Id.*

On February 19, 2001, upon referral from Dr. Bain, Dr. Keith L. Goldberg treated Plaintiff for her "RUQ" pain. TR 291. Dr. Goldberg noted that Plaintiff had had "several stomch [*sic*] surgeries for ulcers in the past," and his physical examination of Plaintiff revealed "Minimal RUQ discomfort." *Id.* Dr. Goldberg stated that he would "plan removal of GB based on gallstones on US," and that he would "plan upper endoscopy as patient with multiple surgeries and no f/u for stomch [*sic*] ulcer in the past."[16] *Id.*

On February 25, 2001, Dr. Bain saw Plaintiff for a follow-up examination regarding her

_____

[14]There are two duplicates of this report at TR 370-371.

[15]The results of the x-ray are not indicated on this record. TR 383. The next x-ray ordered by Dr. Bain and noted in the record was performed on March 12, 2001. *See* TR 365-366.

[16]There is a duplicate of this record at TR 290.

12

right hip and right leg. TR 382. Upon physical examination, Dr. Bain found that Plaintiff had "pain lower back radiating down R leg." *Id.* Dr. Bain did not order laboratory work, but stated, "need MRI L-S Spine." *Id.* Dr. Bain diagnosed Plaintiff with a "panic attack," "osteoarthritis," and "lumbar radiculopathy." *Id.*

On February 27, 2001, Dr. Goldberg ordered an analysis of Plaintiff's gallbladder, which revealed "nodular green gallstones measuring 7 mm and 9 mm respectively." TR 369. Dr. Goldberg performed a "Laparoscopic cholecystectomy; gastroscopy" on Plaintiff's gallbladder, and concluded that Plaintiff had "Cholecystitis; gastric reflux."[17] *Id.*

From March 5, 2001, to March 22, 2001, Dr. Goldberg documented Plaintiff's complaints of fever and abdominal pain following her gallbladder surgery. TR 287-289. On March 19, 2001, Dr. Goldberg prescribed "Bentyl" and Prilosec. TR 287.

On March 12, 2001, Dr. Bain treated Plaintiff for complaints of lower back pain and right hip pain. TR 366. Dr. Bain ordered a scan of Plaintiff's lumbosacral spine, and found "Mild endplate spurring," but "no other abnormality." *Id.* Dr. Bain also ordered a scan of Plaintiff's left hip, which revealed "No radiographic abnormality."[18] TR 365.

On May 1, 2001, Dr. Bain treated Plaintiff for coughing and "itchy eyes." TR 381. Upon physical examination, Dr. Bain observed that Plaintiff's lungs were "clear," and he diagnosed her with bronchitis and "acute sinnusitis [*sic*]."[19] *Id.*

On May 16, 2001, Dr. Bain treated Plaintiff for complaints of a sore throat and an ear-

---

[17]The record contains an illegible "Report of Operation" dated February 27, 2001, that was completed by Dr. Goldberg. TR 367-368.

[18]There is no indication of the type of scan. TR 365-366.

[19]Dr. Bain prescribed medications, the names of which are illegible. TR 381.

13

ache in both ears.  TR 380.  Dr. Bain diagnosed Plaintiff with bronchitis and "acute sinnusitis [*sic*]."  *Id.*

On June 6, 2001, Dr. Jeri L. Lee conducted a psychological evaluation of Plaintiff on behalf of DDS.  TR 292-295.  Dr. Lee stated that Plaintiff "is not considered an accurate historian due to exaggeration of symptoms likely for secondary gain."  TR 292.  Dr. Lee recorded Plaintiff's report: "I had seizures since 1976 and here lately I found out I got arthritis in my spine and emphysema."  *Id.*  Dr. Lee found that Plaintiff's reports of "auditory and visual hallucinations" and "homicidal ideations" were "not convincing."  TR 293.  Dr. Lee stated that Plaintiff had "been unconscious on 2 occasions in conjunction with seizures this past year," and that her "Intellectual functioning is estimated to be in the borderline range and actual reading testing was within the 3rd grade level."  *Id.*  He noted, "She has limited vocabulary and her abstracting ability is weak."  *Id.*  Dr. Lee also recorded Plaintiff's daily activities, and found that her assertions that she was "unable to drive a car, cook meals, dress, remember appointments, shop for groceries, do housework, get along with people, or stick with tasks until they are completed" were "not convincing."  TR 294.  Dr. Lee found that Plaintiff had a third-grade level reading ability and a sixth-grade level arithmetic ability.  TR 295.  With regard to the "mental assessment of ability to do work-related activity," Dr. Lee stated: "At this time, it is believed that her abilities to understand and remember, sustain concentration and persistence, socially interact and to adapt are not significantly limited."  *Id.*  Dr. Lee had the following impressions: "Axis I: No Diagnosis.  Axis II: Deferred.  Rule out borderline intellectual functioning.  Axis III: Deferred.  Axis IV: Chronic pain, 10-year-old granddaughters [*sic*] recent death, brothers [*sic*] recent death.  Axis V: Current : 65.  Past : 70."  *Id.*

On June 19, 2001, Dr. Frank Kupstas conducted a PRTF of Plaintiff. TR 296-301. Dr. Kupstas found that Plaintiff had "Affective Disorders" (TR 296, 297), and "Mental Retardation" (TR 296, 298).[20] Dr. Kupstas assessed Plaintiff as having "Mild" limitations in her "Restriction of Activities of Daily Living," and in her "Difficulties in Maintaining Social Functioning." TR 299. Dr. Kupstas additionally assessed Plaintiff to have "Moderate" to "Mild" "Deficiencies of Concentration, Persistence or Pace." *Id.*

Also on June 19, 2001, Dr. Albert J. Gomez conducted a consultative examination of Plaintiff on behalf of DDS. TR 302-317. Dr. Gomez evaluated Plaintiff in regard to her seizures, "cigarette abuse," and complaints of "chronic shortness of breath, wheezing, cough with white-greenish sputum without blood since 1995." TR 302. Dr. Gomez recorded Plaintiff's assertion that her "symptoms are increased with exertion and cold weather and decreased with medications," and that she experienced "low back pain for the past 8 months without any history of trauma." *Id.* Upon physical examination, Dr. Gomez noted that "both hips had decreased flexion to 110 degrees," and that "both knees had decreased flexion to 120 degrees due to her obesity." TR 304. He also noted that Plaintiff had "a full range of motion in the lumbosacral spine." TR 305. Dr. Gomez further noted that "premedication and post-medication testing was consistent with mild restriction." TR 304, 306-317. Dr. Gomez opined that Plaintiff could "occasionally lift 20-30 pounds in an 8 hour work day," and "could stand or sit at least 6 hours in an 8 hour work day with normal breaks." TR 305. Dr. Gomez' impressions were: "Seizures by history," "Chronic obstructive pulmonary disease," and "Chronic low back pain." *Id.*

On July 31, 2001, Dr. Gomez conducted pulmonary function tests on Plaintiff. TR 306-

---

[20]Dr. Kupstas' handwritten notes are illegible. TR 297-298.

318.  Dr. Gomez found that Plaintiff's results were "consistent with normal spirometry," and that "bronchodilators were not indicated."  TR 318.

On August 6, 2001, Dr. Douglas C. Mathews treated Plaintiff for complaints of "mid lumbar low back pain radiating mostly into her right extremity into her buttock, anterior lateral thigh down to about her knee."  TR 395.  Dr. Mathews reported Plaintiff's complaint that she had experienced "occasional left lower extremity pain but mostly on the right" since November, and that her pain medication and "anti-inflammatories" did not provide her significant relief.  *Id.* Dr. Mathews referenced an MRI from July 11, 2001, and assessed Plaintiff's condition as "Lumbar radiculopathy and cervical radiculopathy versus carpal tunnel syndrome."[21]  *Id.*  Dr. Mathews' treatment plan included a "cervicolumbar myelogram, post myelogram CT and EMG nerve conduction study of the left upper extremities," and he stated that he would "review the studies with her in the next several weeks."  TR 396.

On August 20, 2001, Dr. Burr completed a Physical RFC regarding Plaintiff.  TR 319-325.  Dr. Burr found that Plaintiff had no exertional limitations.  TR 320.  Dr. Burr further found that Plaintiff could frequently perform climbing, balancing, stooping, kneeling, crouching, and crawling, but could never perform climbing on "ladder/rope/scaffolds."  TR 321.  Dr. Burr also asserted that Plaintiff should "avoid concentrated exposure" to "Fumes, odors, dusts, gases, poor ventilation, etc." and "avoid all exposure" to "Hazards (machinery, heights, etc.)."  TR 323.

On August 23, 2001, Dr. Mathews saw Plaintiff for an "evaluation of cervical and lumbar radiculopathy and associated conditions."  TR 398.  Dr. Mathews noted that Plaintiff had become symptomatic in November 2000 with both cervical and lumbar pain.  *Id.*  Dr. Mathews

---

[21]There is a duplicate of the August 6, 2001 examination (TR 395-396) at TR 525-526.

16

conducted an electromyography report, which involved a monopolar needle study, a sensory conduction study, and a motor conduction study. *Id.* Dr. Mathews' impression was that Plaintiff's EMG was normal.[22] TR 399.

Also on August 23, 2001, Dr. Mathews ordered CT scans of Plaintiff's back and neck, which revealed that Plaintiff had a "congenitally borderline small canal C2 through C4," "No spinal cord impingement," "No focal disc herniations," and "Patent neuroforamina." TR 391-392.[23] Dr. Mathews ordered CT scans of Plaintiff's lumbar spine, the results of which revealed Plaintiff's "congenitally small bony canal at L5," "Moderate combined stenosis at L4-5 with crowding of the nerve roots bilaterally," "Mild to moderate combined narrowing at L3-4 with some crowding of the nerve roots in the lateral recesses," and "Mild narrowing of the lateral recesses at L5-S1." TR 549-550.

On September 26, 2001, Dr. Mathews treated Plaintiff for back pain and discussed the possibility of surgery. TR 326. Upon physical examination, Dr. Mathews found that Plaintiff had "normal range of motion" and that her "SLR [was] positive." TR 326. Dr. Mathews ordered a CT scan, which revealed "congenital stenosis at L4-5 with degenerative changes," "disc bulge at L3/4 and L4/5," and "facette arthropathy causing mod[erate] stensosis at L3/4 and L4/5 bilaterally." *Id.* Dr. Mathews stated that Plaintiff had "failed conservative treatment," and had been "admitted for surgical treatment."[24] *Id.*

---

[22]There is a duplicate of this study (TR 398-399) at TR 532-533.

[23]There are duplicates of this record at TR 551-552.

[24]The record contains a September 20, 2001, chest examination of Plaintiff that was performed for the purpose of "[p]reop general anesthesia, lumbar spine stenosis." TR 329-330. Duplicates of this record are found at TR 547-548 and TR 545. As a result of the findings from the September 20, 2001, chest examination, Plaintiff underwent a "CT scan of the chest with

17

On September 27, 2001, Dr. Mathews performed a "Microscopic decompressive lumbar laminectomy, L3 through L5" on Plaintiff. TR 328, 535-538. On September 28, 2001, Dr. Mathews indicated that Plaintiff had an "uneventful post-operative course, " and prescribed "lortab 10, Soma 350." TR 331-332. On September 30, 2001, Dr. Mathews prescribed Keflex for Plaintiff's complaint of wound "drainage." TR 331-332.[25]

On October 10, 2001, Dr. Bain treated Plaintiff for pain in her "anterior chest." TR 378. Dr. Bain examined Plaintiff and found that her lungs were "clear" and that her "ECD" was negative. *Id.* Dr. Bain referred Plaintiff to Dr. Donald J. Russo and Dr. Paulo C. Acosta.[26] *Id.*

On October 15, 2001, Dr. Mathews examined Plaintiff at a "follow-up from her lumbar decompression." TR 388, 522. Dr. Mathews noted that Plaintiff was "doing quite well" and that she should "continue wearing her corset and ambulating." *Id.*

On October 31, 2001, Dr. Russo treated Plaintiff for a complaint of "lower substernal chest pain through to her back that caused her to 'belch.'" TR 338. Dr. Russo noted that Plaintiff's EKG was "Within normal limits," and that the results of her physical examination were normal. *Id.* Dr. Russo assessed Plaintiff's chest pains as "Possible GERD v. angina," and stated that he would "check ETT with Cardiolite - Rest/Stress." *Id.*

Dr. Russo conducted a "Cardiolite" test on November 7, 2001, and reported that Plaintiff had "adequate exercise capacity" and "no chest pain or significant dyspnea." TR 364.

On November 19, 2001, upon referral from Dr. Bain, Dr. Acosta treated Plaintiff for a

---

contrast" on September 24, 2001, which revealed "[no] pulmonary masses." TR 545.

[25]There is a duplicate of TR 331 at TR 523.

[26]Dr. Bain also prescribed medications, the names of which are illegible. TR 378.

18

complaint of seizures. TR 333. Dr. Acosta noted that Plaintiff reported that her seizures began in 1976, and that they occurred every other day for six minutes. TR 334. Dr. Acosta also noted that Plaintiff reported that she had pain in her neck and low back, excessive thirst, nausea with vomiting, nerves and anxiety, and stress. TR 335. Dr. Acosta found that Plaintiff's blood sugar range was between 46 and 112. TR 333. Dr. Acosta noted that, "On 3 occasions, BS was 233, 254, 357." *Id.* Dr. Acosta stated that other "blood tests repeatedly showed 'nothing,'" and that an "EEG in 1987 showed 'nothing.'" TR 334. The results of Plaintiff's physical examination were normal, and Dr. Acosta opined that Plaintiff had a "Seizure disorder." TR 333. Dr. Acosta stated that Plaintiff had "been keeping a hypoglycemia diet" and had "been able to check blood sugar during 'seizures.'" *Id.* Dr. Acosta stated that Plaintiff had "No indication for further neurodiagnostics," and that she should continue a "hypoglycemia diet." *Id.*

On November 20, 2001, Dr. Nicholas John Lippolis examined Plaintiff for "symptoms consistent with hiatal hernia and UGI surgeries," "atypical chest pains," and for a "follow up of Rest/Stress Cardiolite." TR 337. Dr. Lippolis noted that Plaintiff's exercise habits were "inadequate," and that her diet was "unhealthy." *Id.* The results of Plaintiff's physical examination were normal, and Dr. Lippolis found Plaintiff's "Cardiolite within normal limits." *Id.* Dr. Lippolis stated that Plaintiff had "Atypical" chest pain, and indicated that he would "Consider CT of chest." *Id.*

On November 26, 2001, Plaintiff returned to Dr. Mathews for a "follow-up" appointment for her surgery, and reported that her legs were "much improved." TR 388. Dr. Mathews observed that Plaintiff's "wound has healed nicely," and he planned to "decrease to Lorcet 5 mg"

19

and start her on Vioxx.  *Id.*[27]

On January 2, 2002, Dr. Saul A. Juliao consulted with Plaintiff on behalf of DHS.  TR 361.  Dr. Juliao indicated that he had "Insufficient" evidence to determine Plaintiff's impairments and noted:  "This claimant has alleged worsening of condition since the initial analysis of 8/20/01."  *Id.*

On January 20, 2002, Dr. Juliao completed a Physical RFC regarding Plaintiff.  TR 402-409.  Dr. Juliao found that Plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and push and/or pull without limitation.  TR 403.  Dr. Juliao further found that Plaintiff could frequently perform climbing, balancing, stooping, kneeling, crouching, and crawling.  TR 404.  Dr. Juliao stated that Plaintiff should "avoid concentrated exposure" to "Vibration" and "Fumes, odors, dusts, gases, poor ventilation, etc.," and should "avoid even moderate exposure" to "Hazards (machinery, heights, etc.)."  TR 406.

On January 21, 2002, Plaintiff returned to Dr. Mathews with a complaint of "mild issues with back pain, but more notably some right lower extremity radicular pain when she is walking."  TR 387.  Dr. Mathews recorded that Plaintiff reported that her "lumbar corset" had not helped with her pain, and that she could "only walk ten minutes" before she would experience pain.  *Id.*  Upon physical examination, Dr. Mathews noted that Plaintiff had "full strength and normal sensation to light touch."  *Id.*  Dr. Mathews recommended a CT scan and "epidural steroid block on the right L4-5."  *Id.*[28]

_____

[27]There is a duplicate of this record at TR 522.

[28]There is a duplicate of TR 387, without the handwritten date and note, at TR 521.

On February 8, 2002, Dr. Mathews referred Plaintiff to Dr. Born for a "CT scan of the lumbar spine." TR 529. Plaintiff's CT scan revealed that a "Laminectomy expands the canal L3 through S1," and that there was "Mild to moderate foraminal narrowing L4-5," and evidence of "Prior abdominal and pelvic surgery." *Id.*

On February 18, 2002, Dr. Mathews examined Plaintiff for "right lower extremity radicular pain down from her buttock into her calf," which "did get better for about three days after a postoperative epidural steroid block." TR 520. Dr. Mathews reviewed Plaintiff's postoperative studies, and noted that the studies did not reveal any "overt instability in her lumbar spine." *Id.* Dr. Mathews stated that Plaintiff should "continue her medication regimen." *Id.*

From April 8, 2002, to April 10, 2002, Dr. Mathews recorded two telephone conversations with Plaintiff's daughter, who reported that Plaintiff "fell at home," and went to the emergency room for treatment.[29] TR 519.

On April 26, 2002, Dr. Mathews referred Plaintiff for "lumbar spine films, AP and lateral views," "lumbar puncture with intrathecal contrast administration," and "CT scan of the lumbar spine with intrathecal contrast post myelogram." TR 527-528. Plaintiff's CT scan revealed, "Transitional type L5 vertebra," "Transitional L5-S1 disc," "Central laminectomies L3 through S1 expand the bony canal," "No disc herniations," "No significant narrowing of the spinal canal," and "Some extravasation of contrast along the needle tract." TR 528.

On May 20, 2002, Plaintiff returned to Dr. Mathews for complaints of back pain. TR 518. Upon physical examination, Dr. Mathews noted Plaintiff's "mild lumbar paraspinous

_____

[29]The record does not contain emergency room records for this incident. TR 519.

tenderness to palpatation" and "full strength." *Id.* Dr. Mathews stated that Plaintiff was not a "candidate for further decompression," and indicated that he had "also discussed with her, her extensive narcotic and muscle relaxant use." *Id.* Dr. Mathews further stated: "She denies being treated by William Meacham and yet there are several prescriptions she has received on his DEA number." *Id.*

On July 28, 2002, Dr. Cheryl Reinhardt treated Plaintiff for complaints of "upper back" pain and "middle upper back" pain at the Tennessee Christian Medical Center Emergency Room. TR 466. Upon physical examination, Dr. Reinhardt found Plaintiff's "flank tender - minimally reproducible." TR 467. Dr. Reinhardt indicated that Plaintiff moved "easily near end of ER stay," and that she was "requesting 'pain killer' throughout ER stay." TR 467.

On August 27, 2002, Dr. Goldberg treated Plaintiff for "progressive anemia with continued decrease in hematocrit." TR 454. The results of Plaintiff's physical examination were normal. *Id.* Dr. Goldberg recommended that Plaintiff undergo an "upper and lower endoscopy." *Id.*

On September 3, 2002, Dr. Goldberg performed an "Esophagogastroduodenoscopy," and "Total colonoscopy," the results of which were normal. TR 451-453.

On October 25, 2002, Dr. Ruckle and Dr. Michael D. Littell treated Plaintiff for complaints of chest pain and abdominal pain. TR 502-507.[30] Dr. Ruckle ordered an "upper gastrointestinal series with double density barium and air followed by single density barium biphasic technique," which involved a "three-quarter gastectomy" and a "Gastrojejunostomy," which revealed a "Small direct reducible hiatus hernia." TR 506. Plaintiff underwent a chest x-

---

[30]There is a duplicate of this record at TR 411-416.

ray, the results of which were "within normal limits." TR 507.

On November 15, 2002, Dr. John W. Culclasure examined Plaintiff for "Bilateral leg pain, right greater than left (60%)," and "Low back pain (40%)." TR 513. Dr. Culcasure reported that Plaintiff indicated that her pain had lasted for two years, and was a "6" on a "scale of 1-10." *Id.* Dr. Culcasure further reported that Plaintiff experienced "deep" pain in her back, hips, and legs. *Id.* Dr. Culcasure recounted Plaintiff's report that a heating pad or ice pack helped her pain, and that activities such as standing, walking, bending, and lifting made her pain worse. *Id.* Dr. Culcasure reported that Plaintiff found a "morphine pump" and "epidural steroid injections" helpful, but that she did not find surgery to be helpful. *Id.* Upon physical examination, Dr. Culcasure found that Plaintiff's "Range of motion" was "decreased all planes," and that her "Gait and station" was "mildly antalgic." TR 516. Dr. Culcasure's impressions included: "Lumbar post-laminectomy syndrome," "Lumbar degenerative disc disease," "Lumbar radiculopathy," "Lumbar spondylosis," "Myofascial pain syndrome," "Seizure disorder," "Peptic ulcer disease," "Type 2 diabetes mellitus," "Depression and anxiety," "Arthritis," "Emphysema," "Hormone replacement therapy," "Carpal tunnel syndrome with history of bilateral releases," and "Insurance documented history of multiple medical doctors and multiple med's [*sic*]." TR 517. Dr. Culcasure suggested treatments, including a prescription for "Duragesic." *Id.*[31]

On December 13, 2002, Dr. Culclasure treated Plaintiff for complaints of pain in her mid back, right hip, and right leg. TR 544.[32] Dr. Culclasure also noted Plaintiff's complaints of joint pain in her elbows, limitation of motion, leg weakness with exertion, bladder control problems,

---

[31]The last four pages of this evaluation are duplicated at TR 447-450.

[32]There is a duplicate of TR 543-544 at TR 445-446.

and difficulty falling asleep.  *Id.*  Upon physical examination, Dr. Culcasure indicated that Plaintiff's condition was "A & O x 4."  *Id.*  Dr. Culcasure noted that he did not order laboratory tests, but reviewed previous office notes.  TR 543.  Dr. Culclasure's impression was that Plaintiff suffered from "depression/anxiety," "radiculopathy," "arthritis," "spondylosis," "emphysema," "seizure[s]," and "IPUD."  *Id.*  Dr. Culcasure prescribed a "duragesic patch."  *Id.*

On March 7, 2003, Dr. Mathews treated Plaintiff for complaints of "throbbing" and "constant" leg pain and lower back pain, which were associated with leg numbness from prolonged sitting.  TR 541.  Dr. Mathews' system review of Plaintiff revealed "joint swelling," "limitation of motion" in her lower back, "muscle spasm," "numbness and weakness," "leg weakness" with exertion, "change in appetite," "difficulty falling asleep," and a tendency to cry "easily."  *Id.*  Dr. Mathews refilled Plaintiff's "PA patches" and noted that Plaintiff wanted to "avoid SCS Trial if at all possible."  TR 542.[33]

On July 2, 2003, Chief Administrative Law Judge, Ronald E. Miller requested that Dr. Mathews complete a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)," but it does not appear that Dr. Mathews did so.  TR 488-492.  ALJ Miller sent a letter to Dr. Emerson dated July 2, 2003, requesting that he also complete a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)"; it does not appear that this form was completed.  TR 470-474.

On July 8, 2003, Dr. Bain treated Plaintiff at the Vanderbilt University Medical Center Emergency Room because she was involved in a motor vehicle accident.  TR 418-424, 493-

---

[33]The record contains another evaluation from Dr. Mathews, that is undated, and that does not indicate any change in treatment.  TR 539-540.

Case 3:04-cv-00870   Document 14   Filed 06/08/06   Page 24 of 43 PageID #: 24

501.[34] Dr. Bain indicated that Plaintiff was "thrown from [the] vehicle." TR 496. Plaintiff received treatment for her pain, including morphine. TR 421.

Dr. Bain ordered CT scans of Plaintiff's spine and head, which revealed "Negative cranial CT" and a "Small radiodensity which has appearance of calcium present within the soft tissues of the scalp on the right parietal area," which was assessed as "probably old soft tissue calcification." TR 494. Dr. Bain added, "however, if the patient had a laceration in this area then superficial foreign body should be considered." *Id.*

Additionally on July 8, 2003, Dr. Sally A. Santen ordered x-rays of Plaintiff's thoracic spine and lumbar spine, which revealed "Postsurgical changes," and "Suspected acute anterior wedge compression deformity of L1." TR 531.[35]

Plaintiff underwent a CT scan of her lumbar spine on July 9, 2003, which revealed, "Mild/moderate L1 compression deformity appearing predominantly to involve the superior end plate anteriorly," "No significant associated canal stenosis," "No retropulsion," and "Advanced lower lumbar spine facet arthropathy."[36] TR 530. An x-ray from July 9, 2003, of Plaintiff's right toes, revealed a "Minimally displaced and angulated fracture through the neck of the fifth proximal phalanx with associated soft tissue swelling."[37] TR 435. Upon discharge, Plaintiff's small toe on her right foot was taped. TR 424.

On July 10, 2003, Dr. Bain completed a "Medical Assessment to Do Work-Related

_____

[34]This record is largely illegible. TR 418-424.

[35]There is a duplicate of this record at TR 437.

[36]There is a duplicate of this record at TR 434.

[37]The record also contains an unsigned, unspecified type of scan of Plaintiff's "facial" area, from July 17, 2003, which was marked "WNL." TR 433.

Activities (Physical)" form regarding Plaintiff.  TR 429-432.  Dr. Bain indicated that Plaintiff's "lifting/carrying" was affected by her impairments, and that she could occasionally lift and/or carry 10 pounds, and frequently lift and/or carry less than 10 pounds.  TR 429.  Dr. Bain further indicated that Plaintiff's "standing and/or walking" was affected by her impairments, and that she could stand and/or walk for "at least 2 hours in an 8-hour workday."  *Id.*  Dr. Bain found that Plaintiff could sit for "less than about 6 hours in an 8-hour workday," and that her "pushing and/or pulling" abilities were "limited" in both her upper and lower extremities.  TR 430.  Dr. Bain reported that Plaintiff could occasionally perform balancing, kneeling, crouching, crawling, and stooping activities, but could never perform climbing activities.  *Id.*  Dr. Bain indicated that Plaintiff had no manipulative, visual, communicative, or environmental limitations.  TR 432.

On July 25, 2003, Dr. Bain completed another "Medical Assessment to Do Work-Related Activities (Physical)" Form regarding Plaintiff.  TR 426-428.  In this assessment, Dr. Bain indicated that Plaintiff's "lifting/carrying" was affected by her impairments, and that she could occasionally lift and/or carry less than 10 pounds, and frequently lift and/or carry less than 10 pounds.  TR 426.  Dr. Bain further indicated that Plaintiff's "standing and/or walking" was affected by her impairments, and that she could stand and/or walk for "less than 2 hours in an 8-hour workday."  TR 427.  Dr. Bain found that Plaintiff could sit, but "must periodically alternate sitting and standing to relieve pain or discomfort," and that her "pushing and/or pulling" abilities were "limited" in both her upper and lower extremities.  *Id.*  Dr. Bain stated that Plaintiff could occasionally perform balancing activities, but could never perform climbing, kneeling, crouching, or crawling activities.  *Id.*  Dr. Bain indicated that Plaintiff had no manipulative, visual, communicative, or environmental limitations, except for her "limited" manipulative

26

ability to reach in all directions.  TR 428.

On July 28, 2003, Plaintiff returned to Dr. Mathews because of another motor vehicle accident.  TR 512.  Dr. Mathews indicated that Plaintiff had had an x-ray taken at a hospital in Macon County, Tennessee.  *Id.*  Dr. Mathews analyzed the x-ray, which revealed "very mild L1 compression fracture at the superiod endplate anteriorly" and "no significant canal stenosis."  *Id.*  Upon physical examination, Dr. Mathews noted Plaintiff's "full strength" and "Normal stance and gait."  *Id.*  Dr. Mathews stated that he did not "favor any surgical treatment."  *Id.*

On September 5, 2003, Dr. Culclasure performed right "lumbar facet joint nerve block[s]" at "L4/5" and "L5/S1."  TR 511.

On September 18, 2003, Dr. Culcasure treated Plaintiff for her complaint of lower back pain.  TR 510.  Dr. Culcasure reviewed a September 9, 2003, "Lx Facet," which was "negative," and reported that "no significant swelling [was] noted in Lx Spine L1-L5."  TR 509-510.  Dr. Culcasure also reported that Plaintiff had a new condition of "L1 (Mild) Compression FX."  TR 509.  Dr. Culcasure instructed Plaintiff to "notify our office of any controlled substances from other MDs."[38]  *Id.*

## B.  Plaintiff's Testimony

Plaintiff was born on August 21, 1954, and has a sixth grade education.  TR 43.  Plaintiff testified that she could read and write "to a certain level," and that she could add, subtract, multiply, and divide "pretty good."  *Id.*  Plaintiff summarized her work experience over the prior 15-20 years, stating that it had been "Mostly waitress work," and "some factory work."  TR 44.

---

[38]There is an undated letter from Plaintiff to "Dr. Baine [*sic*]," in which she requests refills for her medications; she wrote: "I need these ASAP."  TR 440.

Plaintiff stated that she had worked as a waitress in a restaurant for 23 years. TR 46. Plaintiff testified that waitressing had required her to walk "[a]ll day long, the whole eight hours." TR 44. Plaintiff also stated that her waitress position had required her to lift "five pounds, picking up three or four plates at a time." *Id.* Plaintiff testified that she lifted "[a]bout 15 pounds at a time" when busing tables, and that she had had to stoop, bend, and sweep floors. *Id.* Plaintiff asserted that, at the time of the hearing, she could no longer perform that job because, "I had a hysterectomy, and after that people just got on my nerves, I just, I couldn't take it." TR 44-45. Plaintiff stated that had she last worked as a waitress in 1983. TR 45.

Plaintiff testified that she had worked in a factory, describing her work as, "[p]ick/pack, that's where I had to do a lot of lifting." TR 45. Plaintiff reported that she had worked at two factories, "[b]oth of them about four months, because they closed one down." *Id.* Plaintiff described her job at the second factory, stating that she "[p]icked/packed, you pick orders like for stores," and she explained, "You done [*sic*] a whole lot of lifting and heavy lifting." *Id.* Plaintiff clarified that the heavy lifting sometimes involved "some boxes that weighed about 50 pounds," where "Sometimes you had a partner, and sometimes you didn't." *Id.* Plaintiff testified that she had not done any other factory work. *Id.*

Plaintiff reported that she had begun having seizures in 1976, after her daughter was born. TR 46. Plaintiff testified that her seizures and back pain were her most severe problems, stating: "It just got to the point where it's really changed my life, I'm scared to do anything. Like even getting out walking because I can pass out at anytime." *Id.* Plaintiff testified that she took medication for her seizures. *Id.* Plaintiff explained that she had applied for disability benefits prior to her current disability claim, but that she had gone back to work "because they

28

got my seizures stopped, and I wanted to go back to work." TR 47. Plaintiff testified that her seizures had returned "within three months time" after she began working again. *Id.* Plaintiff stated that she had to stop working at her factory job because the factory would not permit certain types of work "if you're on any kind of medicine." *Id.* Plaintiff also stated that she had experienced side effects from her seizure medication, and she reported that the medication caused her to "just want to lay down and sleep." *Id.* Plaintiff asserted that, at the time of the hearing, her seizures occurred once a week. *Id.* She stated that not resting sufficiently could cause her to have seizures. TR 51. Plaintiff recalled a motor vehicle accident that occurred on July 8, 2003, in which she "went off a cliff, and I don't know if I had a seizure or if I went to sleep or what." TR 48.

 The ALJ asked Plaintiff about the kind of seizures that she experienced, and she replied: "The Social Security doctor they sent me to said it's my nerves caused it [*sic*]." TR 48. Plaintiff stated that her ex-husband was the only person who had "actually seen me pass out." TR 49. Plaintiff further stated that her seizures caused her to "have to sit down and put my head down." *Id.* She added, "I get real shaky, real hot, real weak and disoriented." *Id.*

 Plaintiff testified that Dr. Bain had treated her for her seizures "[f]or about four years now," and that he had prescribed "Tegregtol." *Id.* Plaintiff stated that she had been driving during the period when she had seizures multiple times per week, because she had "no choice," but added that she stopped driving in July 2003. *Id.* Plaintiff reported that the seizures that did not cause her to "pass out" lasted "[a]bout two or three minutes," and that she would be "confused after they first wear off." TR 52. Plaintiff stated that the seizures that caused her to "pass out" would also cause her to "want to sleep the rest of the day, because I'm just tired,

29

exhausted, like if something just drained my energy." *Id.*

Plaintiff testified: "My cuff in my left shoulder is worn out. And the rotary [*sic*] cuff in my right -- left shoulder is worn out." TR 50. Plaintiff stated that she had not had surgery on either shoulder, but that she had received steroid shots. *Id.* Plaintiff testified that she experienced problems with her hands, arms, and shoulders during "[a]nything that I do constantly, or above my head, where I have to raise them above my head." *Id.* Plaintiff recalled that she had had surgery for carpal tunnel syndrome, but that she continued to have "a lot of trouble with my hands swelling." TR 51.

Plaintiff stated that she also had problems with her breathing, and reported that Dr. Bain had informed her that she had "some emphysema." TR 51. Plaintiff testified that she smoked cigarettes, but that she "got down to about three a day." *Id.* Plaintiff also testified that she used two inhalers for her bronchitis and breathing disorder. TR 55.

Plaintiff testified that she was five feet, four inches tall, and weighed 185 pounds. TR 52. Plaintiff stated that she had tried to ride a bike for exercise, but that "it really hurt my back and legs, and I couldn't do it." TR 53. Plaintiff also testified that she had bowel problems, stating, "Sometimes my bowels won't move for a week or so, and then when it does, it's real hard and then it turns into diarrhea, and throwing up at the same time." *Id.*

Plaintiff reported that she could lift "[a]bout two or three pounds." TR 53. She stated that with regard to "[s]tanding and sitting, I have to alternate, I can't do either one very long," and added, "I'm more comfortable laying." TR 53-54. Plaintiff asserted that she would have to "twitch back and forth" when watching a half-hour television program, and would eventually have to stand for "[a]bout ten or fifteen minutes." TR 54. Plaintiff testified that she experienced

30

pain while walking, stating, "[s]ometimes I get to hurting so bad I'm just -- I just shake all over, so I sit down.  And then when I do sit down, I just, I'm just constantly turning and twisting."  *Id.*

### C.  Testimony of Mr. Gary Dorris, Plaintiff's Ex-Husband

Plaintiff's ex-husband, Mr. Gary Dorris, also testified at Plaintiff's hearing.  TR 55-60.

Mr. Dorris stated that he had been married to Plaintiff for "[a]bout 13, 14 months," and that he had observed her on a regular basis between 1997 and the date of the hearing.  TR 55.  Mr.

Dorris asserted that he had seen Plaintiff experience seizures, and he described how she would get "real pale" and begin "sweating a lot."  TR 55-56.  Mr. Dorris testified, "sometimes she comes out of them in a few minutes, and sometimes they'll last several hours."  TR 56.  He continued, "But you know, she's no [*sic*] really out of it, she's just drained, it drains her."  TR 56.  Mr. Dorris testified that, at the time of the hearing, he continued to live with Plaintiff, and that they had lived together for "the last two to three years."  TR 56-57.  Mr. Dorris stated that Plaintiff's seizures occurred "pretty regular there for awhile, but they seem to have got, getting [*sic*] better. ... she may have two or three one week, then go a week or two before she has another one."  TR 57.  Mr. Dorris testified about one of Plaintiff's seizures that had occurred within the past year that "lasted probably three or four minutes," where "she just kind of slumped over in the seat" and "she wouldn't respond to me at all."  *Id.*  Mr. Dorris stated that Plaintiff had "laid down on the couch" after the seizure.  TR 58.

Mr. Dorris testified that Plaintiff had "trouble bending over and stuff like that."  TR 58.

Mr. Dorris also reported that Plaintiff was trying to stop smoking, and that she did not drive.  TR 58-59.  Mr. Dorris corroborated Plaintiff's testimony about her need to walk around after sitting for short periods of time, stating, "she's constantly doing that."  TR 59.  Mr. Dorris stated that

31

Plaintiff experienced "a lot of trouble at night, up and down, with her sleep." *Id.* He explained,

"She has trouble sleeping. Maybe one night she'll sleep good, the next night she's up and down

the whole night long." *Id.*

### D. Vocational Testimony

Vocational expert ("VE"), Jo Ann Bullard, also testified at Plaintiff's hearing. TR 60-65.

The VE classified Plaintiff's past relevant work as a waitress and "Order filler" as "light" and

"semi-skilled." TR 60. The VE testified that Plaintiff had no transferable skills. *Id.* The ALJ

asked the VE if there was any "vocational significance, in an individual functioning at 65 to 70

on the GAF scale," and the VE replied that there was no significance. *Id.*

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and

asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in

the past. TR 61. Specifically, the ALJ asked whether a hypothetical claimant could perform any

of Plaintiff's past relevant work if she had the following conditions and limitations: "seizures by

history, chronic obstructive pulmonary disease, and chronic low back pain," who could

"occasionally lift 20 to 30 pounds," and could "stand or sit at least six hours in an eight-hour day

with normal breaks." *Id.* The VE responded that the hypothetical claimant could perform

Plaintiff's past relevant work. *Id.*

The ALJ asked the VE to assume the limitations from a Physical RFC completed by Dr.

Burr on August 20, 2001.[39] TR 61. The VE responded that the hypothetical claimant would be

---

[39]The ALJ summarized the RFC as, "no exertional limitations," "no climbing of ladders, ropes or scaffolds," "Otherwise frequently performing postural activities ... With the need to avoid concentrated exposure to fumes, odors, dust, gas and poor ventilation," "avoid[ing] all exposure to hazards, such as machinery, heights, et cetera." TR 61.

able to perform Plaintiff's past relevant work.  TR 61-62.

The ALJ then asked the VE to instead assume the limitations from a Physical RFC completed by Dr. Juliao on February 20, 2002.[40]  TR 62.  The VE responded that the hypothetical claimant could perform Plaintiff's past relevant work.  *Id.*

The ALJ again modified the hypothetical, asking the VE to assume the limitations from a "Medical Assessment to Do Work-Related Activities (Physical)" Form completed by Dr. Bain on July 13, 2003.[41]  TR 62.  The VE responded that the hypothetical claimant could perform a limited range of sedentary work.  *Id.*  The ALJ asked the VE to also incorporate Plaintiff's age and education, abilities to perform "limited climbing, otherwise occasional postural activities," "[s]eizure precautions," and "avoidance of more than moderate concentration of dust or fumes." TR 63.  The VE responded that such a hypothetical claimant could perform "sedentary, unskilled occupations."  *Id.*

The VE opined that there were approximately 1,953 addresser positions in Tennessee, and 108,293 nationally; 1,315 table worker positions in Tennessee, and 39,440 nationally; and 104 hand bender positions in Tennessee, and 7,964 nationally, all of which would be appropriate for the hypothetical claimant.  TR 63.  The VE added, "These are not inclusive, these are just

---

[40]The ALJ summarized the RFC as, "capable of lifting 50 pounds occasionally, and 25 frequently," "Standing and walking six hours out of eight," "Sitting for six," "no limitations on pushing or pulling," "Frequently performing all postural activities," "Avoidance of concentrated exposure to vibration, fumes, odors, dust, gas, or poor ventilation," and "avoid[ance] of even moderate exposure to hazards, such as operating machinery or heights."  TR 62.

[41]The ALJ summarized the assessment as, "capable of lifting ten pounds occasionally, less than ten frequently," "Standing and walking at least two hours out of eight," "Sitting for less than six," "Limitations on the use of the upper and lower extremities," "never" being able to "climb," "occasionally" being able to "balance, kneel, crouch, crawl, or stoop," and "Not limited in reaching, handling, fingering, or feeling."  TR 62.

33

samples." *Id.*

The ALJ again modified the hypothetical, asking the VE to assume the limitations from a "Medical Assessment to Do Work-Related Activities (Physical)" Form completed by Dr. Bain on July 25, 2003. TR 63. The VE responded that the hypothetical claimant would not be able to sit or stand for an eight-hour workday, and therefore could not work. *Id.*

The ALJ then asked whether there were any sedentary jobs that had a "sit/stand" option that would accommodate restrictions on exposure to fumes and hazards. TR 64. The VE responded that, by definition, sedentary positions required "prolonged sitting," and, therefore, a "sit/stand" option would not be available. TR 64-65.

Plaintiff's attorney asked the VE whether any jobs would be available if Plaintiff's testimony was found fully credible. TR 65. The VE responded that no jobs would be available. *Id.*

### III.  CONCLUSIONS OF LAW

#### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been

34

further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's

age, education, and work experience, any other relevant work that exists in the national economy

in significant numbers regardless of whether such work exists in the immediate area in which

Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he

or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial
> gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which
> significantly limits his or her ability to work (a "severe"
> impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it
> must be determined whether he or she suffers from one of the
> "listed" impairments[42] or its equivalent.  If a listing is met or
> equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level
> impairments, it must be determined whether the claimant can
> return to the job he or she previously held in light of his or her
> residual functional capacity (e.g., what the claimant can still do
> despite his or her limitations).  By showing a medical condition
> that prevents him or her from returning to such past relevant work,
> the claimant establishes a *prima facie* case of disability.
>
> (5)  Once the claimant establishes a *prima facie* case of disability,
> the burden shifts to the Commissioner to establish the claimant's
> ability to work by proving the existence of a significant number of
> jobs in the national economy which the claimant could perform,
> given his or her age, experience, education, and residual functional
> capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175,

---

[42]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C. Plaintiff's Statement Of Errors

As an initial matter, Plaintiff in this action is proceeding *pro se*. The law is well established that the Court has a duty to liberally construe *pro se* complaints. *See, e.g., Boag v. MacDougall*, 454 U.S. 364 (1982).

Plaintiff argues, "It is the opinion of the claimant that everything that was reported from the doctors and other sources was not given enough wieght [*sic*] and everything that was against her was given the greatest wieght [*sic*]." Docket Entry No. 9. The undersigned will construe

37

Plaintiff's argument to contend that the ALJ erred by failing to find her subjective complaints of pain fully credible and by failing to accord proper weight to the opinions of certain physicians and examinations.

Plaintiff seeks "help for a real problem," and essentially maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

**1.  Subjective Complaints of Pain**

Plaintiff essentially contends that the ALJ erred in failing to find that her subjective complaints of pain were fully credible. Docket Entry No. 9.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's allegations of pain:

38

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other."). Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir.

39

1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6ᵗʰ Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6ᵗʰ Cir. 1981).

In the case at bar, the ALJ, in his decision, discussed the medical and testimonial evidence in great detail. TR 17-30. Additionally, the ALJ discussed Plaintiff's "wide range of daily activities," which he noted "has included caring for a teenage niece, driving, monthly fishing trips, laundry, cooking, managing a checkbook, taking care of children, socializing, sewing and light household chores." TR 26. When recounting the medical and testimonial evidence of record, the ALJ discussed the location, duration, frequency and intensity of Plaintiff's pain, as well as the dosage and effect of her medication. TR 17-30. He further noted the asserted precipitating and aggravating factors of Plaintiff's pain, as well as the measures that Plaintiff took to relieve her pain. *Id.* After considering the record as a whole, however, the ALJ determined that Plaintiff's allegations regarding her limitations were not fully credible. TR 30.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6ᵗʰ Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6ᵗʰ Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6ᵗʰ Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6ᵗʰ Cir.

40

1987)).  If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975).

As has been noted, after assessing all of the medical and testimonial evidence, the ALJ determined that Plaintiff's allegations were not fully credible.  TR 27.  This determination is within the ALJ's province.  Throughout his decision, the ALJ specifically articulated the conflicting evidence and discussed his reasons for according credibility to, or discounting, each piece of evidence.  *See* TR 17-30.

The ALJ observed Plaintiff during her hearing, assessed the medical records, and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper.  Therefore, this claim fails.

## 2.  Substantial Evidence

Plaintiff argues that the ALJ accorded too little weight to the evidence supporting her claims and too much weight to the evidence contrary to her claims.  *Id.*  Plaintiff essentially argues that the ALJ's decision was not supported by substantial evidence.  *Id.*

As explained above, "substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion," *Her*, 203 F.3d at 389 (*citing Richardson*, 402 U.S. at 401), and has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell,* 105 F.3d at 245 (*citing Consolidated Edison Co.,* 305 U.S. at 229).

The record here is replete with doctors' evaluations, medical assessments, test results,

and the like, all of which were properly considered by the ALJ, and all of which constitute "substantial evidence." TR 17-30. Additionally, the ALJ's decision demonstrates that he carefully considered the testimony of both Plaintiff (TR 24-27) and the VE (TR 29). While it is true that some of the testimony and evidence supports Plaintiff's allegations of disability, it is also true that much of the evidence supports the ALJ's decision that Plaintiff was not disabled.

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner*, 745 F.2d at 387. In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273). The ALJ's decision was properly supported by "substantial evidence;" the ALJ's decision, therefore, must stand.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's "Response to Information in the brief be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____

E. CLIFTON KNOWLES
United States Magistrate Judge